**FLITTER MILZ, P.C.**          ATTORNEYS FOR PLAINTIFF
CARY L. FLITTER          MIRIELLE PAUL
ANDREW M. MILZ
JODY T. LÓPEZ-JACOBS
EDWARD M. FLITTER
1814 East Route 70, Suite 350
Cherry Hill, NJ 08003
(856) 396-0600

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MIRIELLE PAUL,<br><br>                    Plaintiff,<br><br>          vs.<br><br>SUNNOVA ENERGY CORPORATION,<br><br>SUNNYMAC LLC,<br><br>                    Defendants. | CIVIL ACTION<br><br>NO.<br><br><br>**COMPLAINT** |

### I.  INTRODUCTION

1.      This is a consumer protection action for damages pursuant to New Jersey's Consumer Fraud Act ("CFA") and other laws.

2.      Defendants are in the business of selling and financing solar panel systems that are installed on consumers' homes. Defendants' sales agents solicit consumers using electronic tablets such as iPads and iPhones to enter into "Power Purchase Agreements" ("PPA") requiring the purchase of solar electricity generated from the panels. The standard term of a PPA is 25 years.

3.      Defendants' sales practices are fraudulent and deceptive, as sales agents regularly misrepresent the nature of the transaction, forge the electronic contracts, and deliberately conceal the forged contracts from consumers, who have been promised significant savings.

4.        Here, Defendants bait-and-switched Plaintiff Mirielle Paul—making an offer for her purchase of a solar panel system for $30,000, with no upfront costs, through a no-interest "subscription" providing for fixed, affordable monthly payments of $100 that never changed.

5.        However, Defendants—through their sales agent—never provided what it had offered. Instead, it forged the signature of Plaintiff on a 25-year PPA providing for monthly payments of about $200 that would increase annually. These terms were never discussed with Plaintiff nor presented to Plaintiff.

6.        Defendants withheld and hid the forged PPA from Plaintiff, who had no knowledge of any forged contract before the panels were installed. Plaintiff received a copy of the forged contract only *after* a solar panel system was installed on her house.

7.        Plaintiff accordingly brings these claims for damages and other equitable relief.

## II.  JURISDICTION

8.        Jurisdiction arises under 28 U.S.C. § 1332, as Plaintiff is the only party who is a citizen of New Jersey, and the amount in controversy exceeds $75,000.

9.        Venue is proper because the offending conduct took place in this district.

## III.  PARTIES

10.        Plaintiff Mirielle Paul is a consumer who resides in New Jersey.

11.        Defendant SunnyMac LLC ("SunnyMac") is a foreign limited liability company incorporated in Delaware. SunnyMac's registered agent is located at 47A Germay Drive, Wilmington, DE 19804.

12.        SunnyMac is in the business of marketing, selling, leasing, designing, constructing, installing, and servicing photovoltaic and/or solar energy systems on residential properties.

13.       SunnyMac holds itself out as a company that specializes in turnkey solar power solutions for homes in Delaware, Maryland, New Jersey, and Pennsylvania.

14.       Defendant Sunnova Energy Corporation ("Sunnova") is a foreign corporation with a principal place of business at 20 Greenway Plaza, Suite 540, Houston, Texas 77046.

15.       Sunnova partners with dealers and contractors who originate, design and install residential solar energy systems for consumers on behalf of Sunnova.

16.       Sunnova regularly partners with and uses sales companies such as SunnyMac and their agents, to enter into PPAs and other contracts for solar products.

17.       With respect to Sunnova's performing PPAs, it receives tax benefits and other incentives from federal, state and local governments.

18.       Sunnova's partner dealers and contractors serve as a local, direct-to-home sales force providing in-person and virtual consultations to source potential customers in each geographic market where Sunnova operates.

19.       Sunnova's partner dealers and contractors reach potential customers through various means, including online, telemarketing, in-store sales, cross-marketing with complementary products and door-to-door canvasing.

20.       Using Sunnova's technology platform and proprietary pricing tool, the Sunnova's partner dealer/contractor selects one of Sunnova's standard-form agreements for the relevant market and product.

21.       Sunnova and its partner dealers and contractors (such as SunnyMac) work together to design the solar energy systems.

22.     Sunnova tells its shareholders: "Through our network model, we provide a streamlined approach for the origination of customer agreements and the installation of solar energy systems, energy storage systems and other sustainable home products."

23.     Sunnova tells its shareholders: "We utilize our extensive tools and services platform, standardized procedures and existing databases to help our dealers comply with our pricing requirements, solar best practices, contract terms, and state, territorial and local regulations. For each solar service agreement, an individualized power production estimate is created by analyzing geographic, solar and weather data with the design's proposed orientation, components and shading. We continue to pursue technological innovation to streamline our review of design and engineering, to expedite installation and to lower costs for our dealers."

24.     Sunnova tells its shareholders: "The installation phase requires the dealer to obtain all necessary permits for installation. For systems requiring commissioning, the dealer must complete our commissioning process for the solar energy system and energy storage system (as applicable), which entails submitting supporting documentation and photographs illustrating the installation of the solar energy system and energy storage system (as applicable) to our quality assurance team for review. Following completion of these steps and our approval of these materials, the dealer submits required paperwork to the applicable electric distribution utility to obtain permission to operate the equipment, schedule required regulatory inspections and arrange for interconnection of the solar energy system to the electrical grid."

25.     Sunnova tells its shareholders: "We carefully recruit our dealers and contractors, who must meet and maintain our standards to be approved. Qualifications to be a dealer/contractor include: experience in the solar industry or success in an applicable sustainable home product industry such as roofing, gas generators, heating, ventilation and air-conditioning,

electrical services or water systems, experienced and appropriately certified employees (including multiple installation teams) and possession of applicable licenses. We also perform a review of the prospects' financial condition as part of our recruitment process, a background check on the principal owners of the organization and a careful review of the businesses' online and local reputation. Upon engagement, the dealer/contractor enters into an agreement with us that sets ongoing standards for operations and payment obligations based on different milestones for each project."

26.     Sunnova tells its shareholders: "We provide training, field support and continuing education to help our dealers/contractors operate efficiently. This includes training related to our processes, standards and services platform, sales training and compliance education regarding applicable rules and regulations."

27.     Sunnova tells its shareholders: "We actively review our dealers'/contractors' performance and compliance with our requirements to determine whether to terminate our relationship with any dealer/contractor that is unable to meet our performance standards."

28.     Sunnova tells its shareholders: "We have created sophisticated cloud-based technology platforms, streamlining the origination, installation, administration, orchestration and servicing of our energy solutions. Our proprietary dealer, customer and energy management software supports customers, dealers and internal users in the sale, installation and management of our products and services. The platforms leverage cloud-based infrastructure and software capabilities using multiple third-party providers, including Salesforce, Amazon Web Services, Heroku, FinancialForce and Infor. The platforms are compatible with multiple end-user device types, including smartphone, tablet and desktop/laptop interfaces."

29.      Sunnova tells its shareholders that one of its "key software platforms" includes the "Sunnova Catalyst Dealer Platform," stating: "Sunnova Catalyst enables dealers to manage leads, design systems, generate quotes and contracts, and create plan sets and commissioning packages through a combination of web, tablet and mobile device interfaces. As part of the quoting feature set, customer pricing is delivered by a combination of cloud-based technologies including Arcadia/Genability, PV Watts (a service of the National Renewable Energy Laboratory) and proprietary applications running on Amazon Web Services and Heroku. We enable dealers to generate customer agreements and proposal documents on demand for presentation to prospective customers. Each completed quote is transferred into Salesforce for agreement generation, customer access and reporting. Sunnova Catalyst also includes features to streamline the approval process for the design and installation of solar energy systems, track install progress and establish a standard process for ongoing service and warranty management."

30.      Sunnova tells its shareholders: "Our growth and operations strategy depends on the continued origination of customer agreements by us and our dealers."

31.      At all times relevant, the sales agent was working under the direction and control of Sunnova and SunnyMac.

32.      Sunnova and SunnyMac have condoned, ratified, approved of, and assumed responsibility for the conduct of the sales agent discussed *infra*.

33.      At all times relevant, Sunnova and SunnyMac required their sales agent to use specific software, applications, and technology when engaging in transactions with consumers on their behalf.

34.     At all times relevant, the sales agent referenced herein was affiliated with Sunnova and SunnyMac, acting as their agent and for their benefit to engage in transactions on their behalf under specified terms and conditions.

35.     At all times relevant, Sunnova and SunnyMac retained the right to control the conduct of the sales agent, including the products that he could offer, the terms and conditions of the products offered, and the method of presentation of the products offered, including the contract documents in question.

36.     The sales agent could not have consummated any transaction without the sales agent's existing relationship with Sunnova and SunnyMac, under which the sales agent was authorized to offer products on their behalf under specified terms and conditions.

37.     At all times relevant, the sales agent solicited and processed applications for credit and financing on behalf of Sunnova.

38.     At all times relevant, Sunnova and SunnyMac had the right to control the marketing and sales methods of the sales agent and the program generally.

## IV. FACTS

### Defendants' Bait and Switch

39.     Mirielle Paul owns and lives at her home located at 10 Quincy Manor Ln, Burlington, NJ 08016.

40.     Plaintiff's primary language is creole.

41.     In or about February 2024, Defendants' sales agent visited Plaintiff at her home in connection with the offer to purchase a solar panel system. The sales agent spoke to Plaintiff in creole.

42.       The sales agent told Plaintiff she would have significant savings, as she could have the system installed without any upfront costs, and would need only pay a fixed monthly payment that never changed.

43.       The monthly payment proposed was $180. Plaintiff believed she could get more favorable terms elsewhere, and in response the sales agent said he would try to get a lower offer.

44.       No PPA—paper or electronic—was sent or shown to Plaintiff at or near the time of the solicitation. The sales agent did not mention whether there would be a loan or financing involved.

45.       Later on, the sales agent sent Plaintiff a new proposal with a fixed monthly payment of $99.

46.       Plaintiff never signed the proposal.

47.       Nonetheless, an inspection was performed of the roof, and in or about April 2024, a solar panel system was installed on Plaintiff's home.

## *Plaintiff Discovers the Forged PPA*

48.       In the summer of 2024, Plaintiff had still not received a contract for the solar panel system.

49.       Instead, to her surprise, Plaintiff received a bill from Sunnova for $266.64, which were set to "Autopay."

50.       Plaintiff, with the assistance of her niece, learned that there was an online Sunnova account, logged into the account, and discovered for the first time a PPA bearing her forged electronic signatures and initials.

51.     The PPA is radically different than what was previously proposed. For one, the sales agent represented that Plaintiff would be purchasing and owning the solar panel system, but under the PPA, Plaintiff would not own the system *at all*.

52.     And, although Plaintiff was promised a fixed monthly payment of $99, the PPA reflects monthly payments of $217.73 or $197.94 for the first year (depending on whether payment was made by auto-ACH), with annual increases to this monthly payment of 2.9% per year for 25 years.

53.     At no point during the solicitation did Defendants explain or disclose these PPA terms to Plaintiff.

54.     Defendants intentionally hid the PPA from Plaintiff, preventing her from being able to exercise her right to cancel.

55.     Defendants continue to deem Plaintiff bound by the forged PPA.

56.     Sunnova told Plaintiff that the only way she could "buy out" of the PPA was to pay approximately $42,000, in which case she would not own the solar panel system, and that the only way she could actually purchase the system is if she continues payments into the sixth year of the PPA and pays an additional $48,000.

### *Defendants Obtain and Use Plaintiff's Consumer Report without a Permissible Purpose*

57.     On March 11, 2024, Defendants, without notice or permission, obtained and used Plaintiff's consumer reports from Experian and Trans Union, without any permissible purpose or authorization.

58.     Defendants required their sales agent to obtain Plaintiff's consumer report for the benefit of Defendants.

59.      At no point during Plaintiff's interaction with Defendants' sales agent was it mentioned that Plaintiff's consumer report would be accessed.

60.      But for Defendants obtaining and using Plaintiff's consumer reports to determine whether she met Sunnova's credit requirements, Defendants would not have been able to proceed.

## *Defendants' Pattern and Practice of Fraudulent and Deceptive Conduct*

61.      Sunnova, as a pattern and practice, regularly engages in forgeries and other fraudulent and deceptive conduct, or enables and condones such conduct.

62.      Consumers across New Jersey and across the country have complained that Sunnova's sales agents have engaged in forgeries or other fraudulent or deceptive conduct.

63.      Some of these irate consumers have complained to organizations like the Better Business Bureau, or to state attorneys general.

64.      Nonetheless, these complaints have not stopped Sunnova from continuing with the same systemic course of conduct of deceiving consumers through the sales companies acting on its behalf and under its purview.

65.      Despite ample notice of serious problems with their corporate processes and operations, Defendants continued to allow, facilitate, and enable their sales agents to engage in forgeries and other fraudulent or deceptive conduct.

## *Damage from Defendants' Fraudulent and Deceptive Conduct*

66.      As a result of Defendants' willful, wanton, reckless, and/or negligent actions, Plaintiff has been damaged.

67.    Defendants' willful, wanton, reckless, and/or negligent conduct has resulted in Plaintiff becoming allegedly obligated on the PPA that she never saw or signed.

68.    Defendants' willful, wanton, reckless, and/or negligent conduct has resulted in Plaintiff being deemed obligated to the PPA.

69.    Plaintiff has suffered mental and emotional distress, worry, and aggravation as a result of Defendants' actions.

<u>COUNT I</u>
<u>New Jersey Consumer Fraud Act</u>

70.    Plaintiff repeats the allegations contained above as if the same were here set forth at length.

71.    Defendants' sales and business practices are subject to the CFA and its regulations.

72.    Defendants are subject to the CFA, N.J.S.A. 56:8-1 et seq. and its regulations.

73.    The CFA, at N.J.S.A. 56:8-2, prohibits the use of "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise."

74.    The deceptive conduct and misrepresentations of Defendants' sales agent, including with respect to its role in obligating Plaintiff to the PPA, violate N.J.S.A. 56:8-2 and constitutes an unconscionable commercial practice.

75.    The CFA also states: "It shall be an unlawful practice for a person in connection with a sale of merchandise to require or request the consumer to sign any document as evidence or acknowledgment of the sales transaction, of the existence of the sales contract, or of the

discharge by the person of any obligation to the consumer specified in or arising out of the transaction or contract, unless he shall at the same time provide the consumer with a full and accurate copy of the document so presented for signature but this section shall not be applicable to orders placed through the mail by the consumer for merchandise." N.J.S.A. 56:8-2.22.

76.     Sunnova's failure to provide Plaintiff the PPA violates the CFA, N.J.S.A. 56:8-2.22 and constitutes a deceptive, misleading, and unconscionable commercial practice under N.J.S.A. 56:8-2.

77.     As a result of Defendants' violations of the CFA, Plaintiff has suffered ascertainable losses, which include the purported contractual obligations of the PPA, and the costs associated with removing the solar panels from the roof of the house (including any necessary repairs).

**WHEREFORE**, Plaintiff Mirielle Paul demands judgment in her favor against Defendants for:

a.  Actual damages;

b.  Treble damages under the Consumer Fraud Act at N.J.S.A. 56:8-19;

c.  Declaratory judgment that the contracts involved herein are void, canceled, and unenforceable;

d.  Equitable relief requiring Defendants to remove the solar panels and repair any damage to Plaintiff's residence;

e.  Reasonable attorneys' fees and costs under the CFA at N.J.S.A. 56:8-19 and all other applicable statutes;

f.  Interest; and

g.  Any other relief the Court deems just and proper.

## COUNT II
### Fraudulent Concealment/Nondisclosure

78.      Plaintiff repeats the allegations contained above as if the same were here set forth at length.

79.      Defendants had a legal obligation to disclose the PPA to Plaintiff, which included many material terms and conditions to which Defendants sought to bind Plaintiff.

80.      Defendants intentionally concealed and did not disclose the PPA to Plaintiff at any point before the installation of the panels on her home.

81.      As a result of Defendants' intentional concealment and nondisclosure, Plaintiff suffered emotional distress, worry, aggravation, and stress, and has been deemed contractually bound to a PPA that she did not sign.

82.      Defendants' concealment and nondisclosure was willful, malicious, wanton, intentional, and reckless.

WHEREFORE, Plaintiff Mirielle Paul demands judgment in her favor and against Defendants for:

(a)    Actual damages;

(b)    Punitive damages;

(c)    Declaratory judgment that the contract involved herein is void, canceled, and unenforceable;

(d)    Equitable relief requiring Defendants to remove the solar panels and repair any damage to Plaintiff's property;

(e)    Interest; and

(f)    Any other relief the Court deems just and proper.

## COUNT III
### Fair Credit Reporting Act

83.    Plaintiff repeats the allegations contained above as if the same were here set forth at length.

84.    Defendants have violated the Fair Credit Reporting Act by willfully and/or negligently obtaining and/or using Plaintiff's consumer credit reports without a statutorily permissible purpose. 15 U.S.C. §§ 1681b(f), 1681n, 1681o.

85.    Defendants have violated the Fair Credit Reporting Act by knowingly and willfully obtaining information on Plaintiff from a consumer reporting agency under false pretenses. 15 U.S.C. §§ 1681q, 1681n, 1681o.

86.    All Defendants used Plaintiff's consumer report to determine her eligibility for the solar panel system, and they did so without Plaintiff's knowledge or consent, without Plaintiff having initiated or intending to initiate any credit transaction, and without a permissible purpose.

87.    Defendants' willful and/or negligent conduct also includes, but is not limited to, the following:

(a) Continuing to give sales agents access to electronic tools that allow them to obtain and/or use a consumer's credit report without the consent of the consumer;

(b) Failing to adopt policies, procedures, and practices that would prevent sales agents from obtaining or using a consumer's credit report without the consent of the consumer;

(c) Failing to supervise sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

(d) Failing to train sales agents to ensure that they would not obtain or use a consumer's credit report without the consent of the consumer;

(e) Disregarding complaints of fraudulent or deceptive conduct and/or impermissible credit pulls by sales agents; and,

(f) Employing quotas and/or sales goals/metrics that incentivize sales agents to obtain or use credit reports without the consent of the consumer.

88.     Defendants' willful and/or negligent corporate action and/or inaction of obtaining and/or using Plaintiff's consumer report proximately caused damage to Plaintiff.

**WHEREFORE**, Plaintiff Mirielle Paul demands judgment against Defendants for:

(a)     Actual and compensatory damages;

(b)     Statutory damages;

(c)     Punitive damages;

(d)     Attorney's fees and costs; and

(e)     Such other and further relief as the Court shall deem just and proper.

## V. **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury as to all issues so triable.

## VI. **CERTIFICATION PURSUANT TO N.J.S.A. 56-8:20**

The undersigned hereby certifies that a copy of the Complaint was sent via first class United States Mail, postage prepaid, to:

Office of the Attorney General
P.O. Box 112
Trenton, NJ 08625-0112

Respectfully submitted:

Date: <u>April 2, 2025</u>

<u>/s/ Andrew M. Milz</u>
CARY L. FLITTER
ANDREW M. MILZ
JODY T. LÓPEZ-JACOBS
**FLITTER MILZ, P.C.**
1814 East Route 70, Suite 350
Cherry Hill, NJ 08003
(856) 396-0600

*Attorneys for Plaintiff*

16

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this day a copy of the foregoing Complaint was electronically filed and served by electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

Date: <u>April 2, 2025</u>

<u>/s/ Andrew M. Milz</u>
ANDREW M. MILZ
**FLITTER MILZ, P.C.**
1814 East Rt 70, Suite 350
Cherry Hill, NJ 08003
(610) 822-0771

*Attorney for Plaintiff*